**EXECUTION**

## EMPLOYMENT AGREEMENT

**THIS EMPLOYMENT AGREEMENT** (this "Agreement") is made as of September 7, 2010, by and between American Purchasing Services, LLC, a Florida limited liability company (the "Company"), and Akhil Agrawal (the "Executive"). This Agreement shall become effective as of the Employment Date (as defined below). Certain definitions are set forth in Section 4 of this Agreement. Capitalized terms used but not otherwise defined herein shall have the meaning set forth in the Limited Liability Company Agreement of American Medical Depot Holdings, LLC ("Holdings"), dated as of August 30, 2010 (the "Holdings LLC Agreement").

WHEREAS, the Company desires to continue to employ the Executive in the capacity and on the terms and conditions set forth herein, and the Executive desires to accept such employment in such capacity and on such terms and conditions; and

WHEREAS, the execution and delivery of this Agreement is a condition precedent to the closing of the transactions contemplated by that certain Unit Purchase Agreement, dated as of September 7, 2010, by and among Holdings, AMD Founders, LLC, a Florida limited liability company, the Executive, Sukrit Agrawal, the Sukrit Agrawal Irrevocable Trust, dated December 31, 2009, the Akhil Agrawal Irrevocable Trust, dated December 31, 2009 and the Flexpoint Ford Investors, pursuant to which Flexpoint Ford Investors purchased an aggregate of 19,400,000 Class B Units and 19,400,000 Common Units from Holdings and AMD Founders;

NOW, THEREFORE, in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties to this Agreement hereby agree as follows:

1.      Employment. The Company agrees to employ the Executive and the Executive accepts such employment for the period (the "Employment Period") beginning as of the Employment Date and ending upon the date Executive ceases to be employed by the Company or any of its Subsidiaries for any reason (a "Separation").

(a)      Position and Duties.

(i)      During the Employment Period, the Executive shall serve as the President and shall have the normal duties, responsibilities and authority implied by such position, subject to the power of the Board to limit such duties, responsibilities and authority. The Company shall not assign the Executive, without his consent, duties that would be inconsistent with those of the President of the Company or those currently performed by the Executive.

(ii)      The Executive shall report to the Board, and the Executive shall devote his full business time and attention to the business and affairs of Holdings, the Company and their respective Subsidiaries.

17581480_2.DOC

Agrawal 000001

(b)     Salary, Bonus and Benefits.

(i)     During the Employment Period, the Company shall pay the Executive an initial base salary of $200,000 per annum, as increased annually by the COLA Adjustment in Section 1(b)(ii). The Executive's annual base salary shall only be increased in addition to the COLA Adjustment with the consent of the Majority Flexpoint Ford Investors (the "Required Consent") (as adjusted from time to time, the "Annual Base Salary"). The Annual Base Salary shall be payable by the Company in regular installments in accordance with the Company's general payroll practices (in effect from time to time).

(ii)     For each fiscal year during the Employment Period, the Annual Base Salary payable for each such fiscal year, beginning with the fiscal year beginning January 1, 2011, shall be increased by the percentage increase in the Consumer Price Index for All Urban Consumers, U.S. City Average, for all items, during the immediately preceding year or, if the U.S. government ceases to publish such index, then by such index published by the U.S. government as is in the Board's judgment most similar to such index; provided that no such percentage increase shall be greater than seven percent (7%) nor less than one percent (1%) per year (the "COLA Adjustment"). During the Employment Period, the Executive may propose that the Annual Base Salary be adjusted to take into account various other factors, including (A) the consummation of acquisitions or other corporate transactions or the general increase in the Company's business that materially increase the duties or responsibilities of the Executive, (B) the performance of Holdings, the Company and their respective Subsidiaries and (C) industry surveys regarding compensation for executives of similarly situated companies (it being understood that the Executive shall have a target compensation at the seventy-fifth (75th) percentile of executives at such similarly situated companies); provided that no such proposal shall be effective without first obtaining the Required Consent.

(iii)     During the Employment Period, the Executive shall be entitled to four weeks of paid vacation each calendar year. Any unused vacation time shall carry over to the subsequent calendar but shall not carry over beyond the end of such subsequent calendar year. During the Employment Period, the Executive shall be entitled to as many holidays, sick days and personal days as are generally provided by the Company from time to time to its employees in accordance with the Company's policies as in effect from time to time.

(iv)     During the Employment Period, the Executive shall be entitled to participate in all of the Company's employee benefit programs for which senior executive employees of the Company and its Subsidiaries are generally eligible.

(v)     In addition to the Annual Base Salary, commencing with the calendar year ending December 31, 2010, the Executive shall receive an annual bonus (the "Annual Bonus"), payable within thirty (30) days following the completion of the Company's audit for each calendar year during the Employment Period (but in any event

- 2 -

Agrawal 000002

during the calendar year following the calendar year to which such bonus applies), of up to fifty percent (50%) of the Annual Base Salary, based upon achievement by the Company and its Subsidiaries of the performance criteria and other goals established at the beginning of the Employment Period or such fiscal year in writing by the Board, subject to the Required Consent, and which performance criteria and other goals may be subject to verification by the Company's independent auditors.  The Board shall deliver such performance criteria and other goals for the Company and its Subsidiaries no later than thirty (30) days after the end of the prior fiscal year.

(vi)    During the Employment Period, the Company shall reimburse the Executive for all reasonable business expenses incurred by him in the course of performing his duties and responsibilities under this Agreement which are consistent with the Company's policies in effect from time to time with respect to travel, entertainment and other business expenses, subject to the Company's requirements with respect to reporting and documentation of such expenses.

(vii)    All amounts payable to the Executive as compensation hereunder shall be subject to all required and customary withholding by the Company.

(c)    <u>Separation</u>.  The Employment Period will terminate upon the earlier to occur of (i) the Executive's Disability or death, (ii) the Executive's termination of the Employment Period for any reason or (iii) the Company's termination of the Employment Period with or without Cause.

(i)    If the Executive's employment is terminated by the Company without Cause, by the Executive for Good Reason or as a result of the Executive's Disability or death, then the Executive, or the Executive's estate, shall be entitled to receive any portion of the Executive's Annual Base Salary owing as of the date of Separation, in each case payable in accordance with the Company's general payroll practices (as in effect on the date of the termination of the Executive's employment).

(ii)    In addition to the payments set forth in <u>Section 1(c)(i)</u>, if the Executive's employment is terminated by the Company without Cause or by the Executive for Good Reason, then the Executive shall be entitled to receive his Annual Base Salary, payable by the Company in regular installments in accordance with the Company's general payroll practices (as in effect on the date of the termination of the Executive's employment), but in no event less frequently than monthly, during the eighteen-month period commencing on the date of termination of employment.

(iii)    Notwithstanding the foregoing, (A) the Executive shall not be entitled to receive any severance payments pursuant to <u>Section 1(c)(ii)</u> (the "<u>Severance Payments</u>") unless the Executive has executed and delivered to the Company a release in the form of <u>Exhibit A</u> attached hereto (the "<u>Employment Release</u>") within sixty (60) days of the Executive's termination of employment and such release is no longer subject to revocation and (B) the Executive shall be entitled to receive such severance payments

- 3 -

only so long as Executive has not materially breached the provisions of <u>Sections 2</u> or <u>3</u> hereof, which if curable, was not cured within ten (10) days of delivery of written notice to the Executive.  The Severance Payments shall not be paid until the first scheduled payment date following the date the Employment Release is executed and no longer subject to revocation, with the first such payment being in an amount equal to the total amount to which the Executive would otherwise have been entitled during the period following the date of termination if such deferral had not been required; <u>provided, however,</u> that any such amounts that constitute nonqualified deferred compensation within the meaning of Internal Revenue Code Section 409A and the regulations and guidance promulgated thereunder ("<u>Code Section 409A</u>") shall not be paid until the sixtieth day following such termination to the extent necessary to avoid adverse tax consequences under Code Section 409A, and, if such payments are required to be so deferred, the first payment shall be in an amount equal to the total amount to which the Executive would otherwise have been entitled during the period following the date of termination if such deferral had not been required.  Except as otherwise expressly provided in this <u>Section 1(c)</u>, the Executive shall not be entitled to receive any severance payments from and after the date of termination.

    2.    <u>Confidential Information</u>.

    (a)    <u>Obligation to Maintain Confidentiality</u>.  The Executive acknowledges that the information, observations and data (including trade secrets) obtained by him during the course of his performance under this Agreement concerning the business or affairs of Holdings, the Company and any of their respective Subsidiaries ("<u>Confidential Information</u>") are the property of Holdings, the Company or such Subsidiaries, including information concerning acquisition opportunities in or reasonably related to the Company's business or industry of which the Executive becomes aware during the Employment Period.  Without limiting the foregoing, the Executive acknowledges and agrees that "Confidential Information" includes: (i) information relating to Holdings', the Company's and their respective Subsidiaries' proprietary ideas and products, current and planned business, marketing and distribution methods and techniques, cost and pricing of Holdings', the Company's and their respective Subsidiaries' products and services, lists of Holdings', the Company's and their respective Subsidiaries' past, present and prospective licensees, distributors, customers, suppliers, vendors, lenders, independent contractors and employees, including their names, current and anticipated customer requirements, market studies, business plans, proprietary computer software (including object code and source code), database technologies, and any other similar or related information, (ii) information concerning the business and affairs of Holdings, the Company and their respective Subsidiaries (which includes historical financial statements, financial projections and budgets, historical and projected revenues, capital spending budgets and plans, the names of key personnel and personnel training techniques and materials) and (iii) notes, analyses, compilations, studies, summaries, and other material prepared by or for Holdings, the Company and their respective Subsidiaries containing or based, in whole or in part, on any such information; <u>provided, however</u>, that the "Confidential Information" shall not include information that was, is now, or becomes generally available to the public (but not as a result of a breach of any duty of

- 4 -

Agrawal 000004

confidentiality by which the Executive is bound or by a breach of any duty of confidentiality by which a third party is bound and of which the Executive is aware). Therefore, the Executive agrees that he will not disclose to any unauthorized Person or use for his own account any Confidential Information without the Board's written consent, unless and to the extent that the Confidential Information is (i) required to be disclosed pursuant to any applicable law or court order or (ii) disclosed by the Executive in the ordinary course of the Company's business as a proper part of his employment for the benefit of the Company or its Subsidiaries in connection with communications with customers, vendors and other proper parties. Upon request of the Board, the Executive shall deliver to the Company at a Separation, or at any other time following a Separation, all memoranda, notes, plans, records, reports, computer tapes, printouts and software and other documents and data (and copies thereof) relating to the Confidential Information, Work Product (as defined below) or the business of Holdings, the Company and any of their respective Subsidiaries (including, without limitation, all acquisition prospects, lists and contact information) which he may then possess or have under his control.

(b)     Ownership of Property.  The Executive acknowledges that all discoveries, concepts, ideas, inventions, innovations, improvements, developments, methods, processes, programs, designs, analyses, drawings, reports, patent applications, copyrightable work and mask work (whether or not including any confidential information) and all registrations or applications related thereto, all other proprietary information and all similar or related information (whether or not patentable) that relate to Holdings', the Company's or any of their respective Subsidiaries' actual or planned business, research and development, or existing or planned future products or services and that are conceived, developed, contributed to, made, or reduced to practice by the Executive (either solely or jointly with others) pursuant to his employment (whether before or after the date hereof) by Holdings, the Company or any of their respective Subsidiaries (including any of the foregoing that constitutes any proprietary information or records) ("Work Product") belong to Holdings, the Company or such Subsidiary and the Executive hereby assigns, and agrees to assign, all such Work Product to Holdings, the Company or to such Subsidiary. Any copyrightable work prepared in whole or in part by the Executive in the course of his work for any of the foregoing entities shall be deemed a "work made for hire" under the copyright laws, and Holdings, the Company or such Subsidiary shall own all rights therein. To the extent that any such copyrightable work is not a "work made for hire," the Executive hereby assigns and agrees to assign to Holdings, the Company or such Subsidiary all right, title, and interest, including without limitation, copyright in and to such copyrightable work. At the request of the Board, the Executive shall promptly disclose such Work Product and copyrightable work to the Board and perform all actions reasonably requested by the Board to establish and confirm Holdings', the Company's or such Subsidiary's ownership (including, without limitation, assignments, consents, powers of attorney, and other instruments).

(c)     Third-Party Information. The Executive understands that Holdings, the Company and their respective Subsidiaries will receive from third parties confidential or proprietary information ("Third-Party Information") subject to a duty on Holdings', the Company's and their respective Subsidiaries' part to maintain the confidentiality of such information and to use it only for certain limited purposes. During the Employment Period and

- 5 -

Agrawal 000005

thereafter, and without in any way limiting the provisions of <u>Section 2(a)</u> above, the Executive will hold Third-Party Information confidentially in accordance with any confidentiality agreement executed by Holdings, the Company or any of their Subsidiaries, or at a minimum, the Company's policies regarding such materials.

3.     <u>Noncompetition and Nonsolicitation</u>.  The Executive acknowledges that in the course of his employment with the Company he will become familiar with Holdings', the Company's and its Subsidiaries' trade secrets and with other Confidential Information concerning Holdings, the Company and such Subsidiaries and that his services will be of special, unique and extraordinary value to Holdings, the Company and such Subsidiaries.  Therefore, the Executive agrees that:

(a)     <u>Noncompetition</u>.  During the Employment Period and for a period of two (2) years thereafter, the Executive shall not directly or indirectly, anywhere in the United States, its territories and the Caribbean, directly or indirectly own, manage, control, participate in, consult with, render services for, or in any manner engage in any business competing with the businesses of Holdings, the Company or any of their respective Subsidiaries.  Nothing herein shall prohibit the Executive from being a passive owner of not more than five percent (5%) of the outstanding stock of any class of a corporation that is publicly traded, so long as the Executive has no active participation in the business of such corporation.

(b)     <u>Nonsolicitation</u>.  During the Employment Period and for a period of one (1) year thereafter, Executive shall not directly or indirectly through another entity (i) induce or attempt to induce any employee or independent contractor of Holdings, the Company or their respective Subsidiaries to leave the employ of, or terminate the independent contractor relationship with, Holdings, the Company or such Subsidiary, or in any way intentionally and materially interfere with the relationship between Holdings, the Company and any of their respective Subsidiaries and any employee or independent contractor thereof, (ii) hire any person who was an employee of Holdings, the Company or any of their respective Subsidiaries within 180 days after such person ceased to be an employee of Holdings, the Company or any of their respective Subsidiaries, (iii) induce or attempt to induce any customer, supplier, licensee or other business relation of Holdings, the Company or any of their respective Subsidiaries to cease or decrease doing business with Holdings, the Company or such Subsidiary or in any way intentionally and materially interfere with the relationship between any such customer, supplier, licensee or business relation and Holdings, the Company and any Subsidiary or (iv) directly or indirectly acquire or attempt to acquire an interest in any business relating to the business of Holdings, the Company or any of their respective Subsidiaries and with which Holdings, the Company and any of their respective Subsidiaries has, to the knowledge of the Executive, entertained discussions or has requested and received information relating to the acquisition of such business by Holdings, the Company or any of their respective Subsidiaries in the one (1) year period immediately preceding a Separation.

(c)     <u>Enforcement</u>.  If, at the time of enforcement of <u>Section 2</u> or this <u>Section 3</u>, a court holds that the restrictions stated herein are unreasonable under circumstances then existing, the parties hereto agree that the maximum duration, scope or geographical area

- 6 -

Agrawal 000006

reasonable under such circumstances shall be substituted for the stated period, scope or area and that the court shall be allowed to revise the restrictions contained herein to cover the maximum duration, scope and area permitted by law.  Because the Executive's services are unique and because the Executive has access to confidential information, the parties hereto agree that money damages would be an inadequate remedy for any breach of this Agreement.  Therefore, in the event a breach or threatened breach of this Agreement, Holdings, the Company, their respective Subsidiaries may, in addition to other rights and remedies existing in their favor, apply to any court of competent jurisdiction for specific performance and/or injunctive or other relief in order to enforce, or prevent any violations of, the provisions hereof (without posting a bond or other security).  Executive shall pay all costs, attorneys' fees and other expenses, paid or incurred by Holdings, the Company or their respective Subsidiaries, in enforcing Section 2 or this Section 3, whether such costs, attorneys' fees and other expenses are incurred prior to suit or after institution of suit, including any appeals.

   (d) Additional Acknowledgments.  The Executive acknowledges that the provisions of this Section 3 are in consideration of:  (i) employment with the Company, (ii) the acquisition of Class B Units from an Affiliate of Executive by the Flexpoint Ford Investors and (iii) additional good and valuable consideration as set forth in this Agreement.  In addition, the Executive agrees and acknowledges that the restrictions contained in Section 2 or this Section 3 do not preclude the Executive from earning a livelihood, nor do they unreasonably impose limitations on Executive's ability to earn a living.  The Executive acknowledges (i) that the business of Holdings, the Company and their respective Subsidiaries will be conducted throughout the United States, its territories and the Caribbean, (ii) notwithstanding the state of incorporation or principal office of Holdings, the Company or any of their respective Subsidiaries, it is expected that Holdings, the Company and their respective Subsidiaries will have business activities and have valuable business relationships within its industry throughout the United States, its territories and the Caribbean and (iii) as part of his responsibilities, Executive will be traveling throughout the United States, and may be traveling elsewhere in the United States, its territories and the Caribbean, in furtherance of Holdings', the Company's and their respective Subsidiaries' business and their relationships.  The Executive agrees and acknowledges that the potential harm to Holdings, the Company and their respective Subsidiaries of the non-enforcement of Section 2 or this Section 3 outweighs any potential harm to the Executive of its enforcement by injunction or otherwise.  The Executive acknowledges that he has carefully read this Agreement and has given careful consideration to the restraints imposed upon the Executive by this Agreement, and is in full accord as to their necessity for the reasonable and proper protection of confidential and proprietary information of Holdings, the Company and their respective Subsidiaries now existing or to be developed in the future.  The Executive expressly acknowledges and agrees that each and every restraint imposed by this Agreement is reasonable with respect to subject matter, time period and geographical area.

Agrawal 000007

## GENERAL PROVISIONS

4.   <u>Definitions</u>.

"<u>Affiliate</u>" of any particular Person means any other Person controlling, controlled by or under common control with such particular Person, where "control" means the possession, directly or indirectly, of the power to direct the management and policies of a Person whether through the ownership of voting securities, by contract or otherwise, and such "control" will be presumed if any Person owns ten percent (10%) or more of the voting capital stock or other Equity Interests, directly or indirectly, of any other Person.

"<u>Annual Base Salary</u>" has the meaning set forth in <u>Section 1(b)(i)</u>.

"<u>Board</u>" means the Company's board of managers.

"<u>Cause</u>" means (i) the conviction of, or entry of a plea of guilty or <u>nolo contendere</u>, to a felony (excluding traffic offenses) or any crime involving dishonesty, breach of trust or fraud with respect to Holdings, the Company or any of their respective Subsidiaries or any of their customers or suppliers or stockholders, (ii) repeatedly reporting to work under the influence of alcohol or illegal drugs causing Holdings, the Company or any of their respective Subsidiaries substantial public disgrace or disrepute or substantial economic harm, or clinical dependence upon the use or consumption of alcohol or any other legal drug or chemical substance that is not prescribed by a board certified medical doctor or psychiatrist, (iii) willful and continued failure to substantially perform duties of the office held by the Executive as reasonably directed by the Board or willful and continued refusal or failure to act in accordance with any specific, lawful direction or order of the Board, each after (x) written demand for substantial performance is delivered by the Company specifically identifying the manner in which the Company believes the Executive has not substantially performed such duties and (y) if curable, the Executive has failed to substantially comply with such written demand within thirty (30) days after his receipt thereof, (iv) continued unfitness or unavailability for service (other than as a result of death or Disability) for a period of ten (10) business days after the Executive's receipt of notice from the Company identifying such deficiencies, or (v) any material breach of <u>Section 2</u> or <u>Section 3</u> of this Agreement by the Executive.

"<u>Code Section 409A</u>" has the meaning set forth in <u>Section 1(c)(iii)</u>.

"<u>COLA Adjustment</u>" has the meaning set forth in <u>Section 1(b)(ii)</u>.

"<u>Confidential Information</u>" has the meaning set forth in <u>Section 2(a)</u>.

"<u>Disability</u>" means the disability of the Executive caused by any physical or mental injury, illness or incapacity as a result of which the Executive is unable to effectively perform the essential functions of the Executive's duties as determined by the Company's disability insurance policy.

Agrawal 000008

"Employment Date" means the date hereof.

"Employment Period" has the meaning set forth in Section 1.

"Employment Release" has the meaning set forth in Section 1(c)(iii).

"Executive" has the meaning set forth in the Preamble.

"Holdings" has the meaning set forth in the Preamble.

"Holdings LLC Agreement" has the meaning set forth in the Preamble.

"Good Reason" means, at any time when the Founders and their Family Groups no longer collectively have appointed or have the right to appoint a majority of the managers to the Board, (i) a change in the Executive's principal office to a location outside a twenty-five (25) mile radius of the Executive's principal office on the date hereof without the express consent of the Executive; (ii) a material breach of this Agreement by the Company; (iii) a material diminution in the Executive's authority, duties or responsibilities, other than as reasonably required by a change in the business of Holdings, the Company and their respective Subsidiaries; (iv) a reduction in the Executive's Annual Base Salary as the same may be increased from time to time; or (v) a requirement for the Executive to be supervised and directed by anyone other than the Board; provided, in each case, that if curable, the Company has failed to substantially cure such condition within thirty (30) days after receipt of written notice thereof from the Executive.

"Person" means a natural person, a partnership, a limited liability company, a corporation, a joint stock company, a trust, a joint venture, investment fund, any other business entity and a governmental entity or any department, agency or political subdivision thereof.

"Required Consent" has the meaning set forth in Section 1(b)(i).

"Separation" has the meaning set forth in Section 1.

"Severance Payments" has the meaning set forth in Section 1(c)(ii).

"Subsidiary" means, with respect to any Person, any corporation, limited liability company, partnership, association or other business entity of which (i) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers, or trustees thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof, or (ii) if a limited liability company, partnership, joint venture, association or other business entity (other than a corporation), a majority of membership, partnership or other similar ownership interest thereof or the power to elect or appoint a majority of the managers or governing body thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof; provided that Allied Joint Venture, LLC and Alliance Joint Venture, Inc. shall be deemed Subsidiaries of the Company for purposes of this Agreement.  For

- 9 -

Agrawal 000009

purposes hereof, and without limitation, a Person or Persons shall be deemed to have a majority ownership interest in a limited liability company, partnership, association or other business entity (other than a corporation) if such Person or Persons shall be allocated a majority of limited liability company, partnership, association, or other business entity gains or losses or shall be or control the sole, or a majority of the, managing director(s), managing member(s), manager(s), board of manager(s) or general partner of such limited liability company, partnership, association or other business entity.

"Third-Party Information" has the meaning set forth in Section 2(c).

"Work Product" has the meaning set forth in Section 2(b).

5.   Notices.   All notices, requests, demands and other communications permitted or required to be given or delivered under or by reason of the provisions of this Agreement shall be in writing and shall be deemed conclusively to have been given (i) when personally delivered, (ii) when sent by facsimile (with hard copy to follow) during a business day (or on the next business day if sent after the close of normal business hours or on any non-business day), (iii) when sent by electronic mail (with hard copy to follow) during a business day (or on the next business day if sent after the close of normal business hours or on any non-business day), (iv) one business day after being sent by reputable overnight express courier (charges prepaid), or (v) three business days following mailing by certified or registered mail, postage prepaid and return receipt requested.   Unless another address is specified in writing, notices, requests, demands and communications to the parties shall be sent to the addresses indicated below:

If to the Company:

American Purchasing Services, LLC
4380 NW 135th Street
Opa Locka, FL 33064
Attention:  President
Telephone: (305) 364-0888
Facsimile:  (305) 364-0877

with copies to (which shall not constitute notice):

Flexpoint Ford, LLC
676 N. Michigan Ave., Suite 3300
Chicago, Illinois  60611
Attention:      Ethan A. Budin
                Jonathan T. Oka
Telephone: (312) 327-4520
Facsimile: (312) 327-4525

- 10 -

Agrawal 000010

Kirkland & Ellis LLP
300 N. LaSalle Street
Chicago, Illinois  60654
Attention:     Sanford E. Perl, P.C.
                     Jeffrey A. Fine, P.C.
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

If to the Executive:

Akhil Agrawal
4380 NW 135th Street
Opa Locka, Florida 33064
Telephone: (305) 364-0888
Facsimile: (305) 364-0877

or such other address or to the attention of such other Person as the recipient party shall have specified by prior written notice to the sending party.  Any notice under this Agreement will be deemed to have been given when so delivered or sent or, if mailed, 5 days after deposit in the U.S. mail.

6.     General Provisions.

(a)     Investor Rights Agreement. To the extent of any conflict between this Agreement and the Investor Rights Agreement, the terms of this Agreement are expressly subject to the Investor Rights Agreement. The Company shall enforce the provisions of this Agreement in good faith and exercise all of its rights and remedies thereunder as appropriate and in the best interests of the Company and, without the prior written consent of the Majority Flexpoint Ford Investors, the Company shall not amend, modify or supplement, or waive any provisions of this Agreement.

(b)     Severability.  Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under any applicable law or rule in any jurisdiction, such invalidity, illegality or unenforceability will not affect any other provision or any other jurisdiction, but this Agreement will be reformed, construed and enforced in such jurisdiction as if such invalid, illegal or unenforceable provision had never been contained herein.

(c)     Complete Agreement.   This Agreement, those documents expressly referred to herein and other documents of even date herewith embody the complete agreement and understanding among the parties and supersede and preempt any prior understandings, agreements or representations by or among the parties, written or oral, which may have related to the subject matter hereof in any way.

- 11 -

Agrawal 000011

(d)     No Strict Construction.  The language used in this Agreement shall be deemed to be the language chosen by the parties hereto to express their mutual intent, and no rule of strict construction shall be applied against any party.

(e)     Counterparts.  This Agreement may be executed in separate counterparts (including by means of facsimile), each of which is deemed to be an original and all of which taken together constitute one and the same agreement.

(f)     Successors and Assigns.  Except as otherwise provided herein, this Agreement shall bind and inure to the benefit of and be enforceable by Executive and the Company; provided that the rights and obligations of the Executive and the Company under this Agreement shall not be assignable.  Any provision hereof requiring the consent of the Flexpoint Ford Investors or otherwise granting any rights to the Flexpoint Ford Investors shall inure to the benefit of and be enforceable by the Flexpoint Ford Investors and their respective successors and assigns that are permitted under the Holdings LLC Agreement.

(g)     Choice of Law.  All questions concerning the construction, validity and interpretation of this Agreement and the exhibits hereto will be governed by and construed in accordance with the internal laws of the State of Florida, without giving effect to any choice of law or conflict of law provision or rule (whether of the State of Florida or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Florida.

(h)     MUTUAL  WAIVER  OF  JURY  TRIAL.    BECAUSE  DISPUTES ARISING IN CONNECTION WITH COMPLEX TRANSACTIONS ARE MOST QUICKLY AND ECONOMICALLY RESOLVED BY AN EXPERIENCED AND EXPERT PERSON AND THE PARTIES WISH STATE OF FLORIDA AND FEDERAL LAWS TO APPLY (RATHER THAN ARBITRATION RULES), THE PARTIES DESIRE THAT THEIR DISPUTES BE RESOLVED BY A JUDGE APPLYING SUCH APPLICABLE LAWS. THEREFORE, TO ACHIEVE THE BEST COMBINATION OF THE BENEFITS OF THE JUDICIAL SYSTEM AND OF ARBITRATION, EACH PARTY TO THIS AGREEMENT HEREBY WAIVES ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, SUIT, OR PROCEEDING BROUGHT TO RESOLVE ANY DISPUTE BETWEEN OR AMONG ANY OF THE PARTIES HERETO, WHETHER ARISING IN CONTRACT, TORT, OR OTHERWISE, ARISING OUT OF, CONNECTED WITH, RELATED OR INCIDENTAL TO THIS AGREEMENT, THE TRANSACTIONS CONTEMPLATED HEREBY AND/OR THE RELATIONSHIP ESTABLISHED AMONG THE PARTIES HEREUNDER.

(i)     Remedies.  Each of the parties to this Agreement will be entitled to enforce its rights under this Agreement specifically, to recover damages and costs (including attorney's fees) caused by any breach of any provision of this Agreement and to exercise all other rights existing in its favor.  The parties hereto agree and acknowledge that money damages may not be an adequate remedy for any breach of the provisions of this Agreement and that any party may in its sole discretion apply to any court of law or equity of competent jurisdiction (without posting any bond or deposit) for specific performance and/or other injunctive relief in order to enforce or prevent any violations of the provisions of this Agreement.

Agrawal 000012

(j)     <u>Amendment and Waiver</u>.  The provisions of this Agreement may be amended, supplemented and waived only with the prior written consent of the Company, the Executive and the Majority Flexpoint Ford Investors.

(k)     <u>Indemnification and Reimbursement of Payments on Behalf of Executive</u>. Holdings, the Company and their respective Subsidiaries shall be entitled to deduct or withhold from any amounts owing from Holdings, the Company or any of their respective Subsidiaries to Executive any federal, state, local or foreign withholding taxes, excise taxes, or employment taxes ("<u>Taxes</u>") imposed with respect to Executive's compensation (including wages and bonuses). In the event Holdings, the Company or their respective Subsidiaries does not make such deductions or withholdings, Executive shall indemnify Holdings, the Company and their respective Subsidiaries for any amounts paid with respect to any such Taxes, together with any interest, penalties and related expenses thereto.

(l)     <u>The Executive's Representations</u>.  The Executive hereby represents and warrants to the Company that (i) the execution, delivery and performance of this Agreement by the Executive do not and shall not conflict with, breach, violate or cause a default under any contract, agreement, instrument, order, judgment or decree to which the Executive is a party or by which he is bound, (ii) the Executive is not a party to or bound by any employment agreement, consulting agreement, noncompete agreement, non-solicitation agreement or confidentiality agreement with any other person or entity that conflicts with this Agreement or could reasonably be expected to affect the Executive's ability to satisfy his duties to Holdings, the Company or any of their respective Subsidiaries, and (iii) upon the execution and delivery of this Agreement by the Company, this Agreement shall be the valid and binding obligation of the Executive, enforceable in accordance with its terms. The Executive acknowledges and agrees that no provision contained herein shall entitle the Executive to remain in the employment of Holdings, the Company or any of their respective Subsidiaries or affect the right of Holdings, the Company or any of their respective Subsidiaries to terminate the Executive's employment at any time for any reason.  The Executive hereby acknowledges and represents that he has consulted with independent legal counsel regarding his rights and obligations under this Agreement and that he fully understands the terms and conditions contained herein.

(m)     <u>Termination</u>.  This Agreement (except for the provisions of <u>Sections 1(a)</u> and  <u>1(b)</u>) shall survive a Separation and shall remain in full force and effect after such Separation.

(n)     <u>No Third-Party Beneficiaries</u>.  Except as specifically provided in this Agreement and for the estate of the Executive in the event of his death, nothing herein expressed or implied is intended or shall be construed to confer upon or give to any Person other than the parties hereto and their respective permitted successors and assigns, any rights or remedies under or by reason of this Agreement, such third parties specifically including employees and creditors of the Company.

- 13 -

(o)     Code Section 409A Compliance.

(i)     The intent of the parties is that payments and benefits under this Agreement comply with Code Section 409A and, accordingly, to the maximum extent permitted, this Agreement shall be interpreted to be in compliance therewith. In no event whatsoever shall the Company be liable for any additional tax, interest or penalty that may be imposed on the Executive by Code Section 409A or damages for failing to comply with Code Section 409A.

(ii)    A termination of employment shall not be deemed to have occurred for purposes of any provision of this Agreement providing for the payment of any amounts or benefits upon or following a termination of employment unless such termination is also a "separation from service" within the meaning of Code Section 409A and, for purposes of any such provision of this Agreement, references to a "termination," "termination of employment" or like terms shall mean "separation from service." Notwithstanding anything to the contrary in this Agreement, if the Executive is deemed on the date of termination to be a "specified executive" within the meaning of that term under Code Section 409A(a)(2)(B), then with regard to any payment or the provision of any benefit that is considered deferred compensation under Code Section 409A payable on account of a "separation from service," such payment or benefit shall not be made or provided until the date which is the earlier of (A) the expiration of the six (6)-month period measured from the date of such "separation from service" of the Executive, and (B) the date of the Executive's death, to the extent required under Code Section 409A. Upon the expiration of the foregoing delay period, all payments and benefits delayed pursuant to this Section 6(o) (whether they would have otherwise been payable in a single sum or in installments in the absence of such delay) shall be paid or reimbursed to the Executive in a lump sum, and any remaining payments and benefits due under this Agreement shall be paid or provided in accordance with the normal payment dates specified for them herein.

(iii)   To the extent that reimbursements or other in-kind benefits under this Agreement constitute "nonqualified deferred compensation" for purposes of Code Section 409A, (A) all such expenses or other reimbursements hereunder shall be made on or prior to the last day of the taxable year following the taxable year in which such expenses were incurred by the Executive, (B) any right to such reimbursement or in-kind benefits shall not be subject to liquidation or exchange for another benefit, and (C) no such reimbursement, expenses eligible for reimbursement, or in-kind benefits provided in any taxable year shall in any way affect the expenses eligible for reimbursement, or in-kind benefits to be provided, in any other taxable year.

(iv)    For purposes of Code Section 409A, the Executive's right to receive any installment payments pursuant to this Agreement shall be treated as a right to receive a series of separate and distinct payments.

- 14 -

Agrawal 000014

(v)     Notwithstanding any other provision of this Agreement to the contrary, in no event shall any payment under this Agreement that constitutes "nonqualified deferred compensation" for purposes of Code Section 409A be subject to offset by any other amount unless otherwise permitted by Code Section 409A.

*    *    *    *    *

Agrawal 000015

IN WITNESS WHEREOF, the parties hereto have executed this Employment Agreement on the date first written above.

AMERICAN PURCHASING SERVICES, LLC

By:

Name: Suresh Agrawal

Its: Chief Executive Officer

Akhil Agrawal

<u>Exhibit A</u>

## EMPLOYMENT RELEASE

I, Akhil Agrawal, in consideration of the payment of the Severance Payments (as defined herein) by American Purchasing Services, LLC, a Florida limited liability company ("<u>Employer</u>") pursuant to the Employment Agreement, dated as of September 7, 2010 (the "<u>Agreement</u>"), do hereby release and forever discharge as of the date hereof Employer and its subsidiaries, parents, and affiliates, together with each of their current and former principals, directors, managers, officers, agents, shareholders, representatives, employees, and each of their heirs, executors, successors and assigns (collectively, the "<u>Released Parties</u>") to the extent provided below.

1. I acknowledge that subject to (i) my execution and non-revocation of this Employment Release and (ii) the express limitations of the Agreement, during the eighteen-month period commencing on the date of my separation from employment with the Employer and its subsidiaries (collectively, the "<u>Company</u>"), I will be entitled to receive my Annual Base Salary of $[_____] consistent with Employer's past practice (collectively, the "<u>Severance Payments</u>"), payable by Employer in regular installments in accordance with Employer's general payroll practices (in effect from time to time). I acknowledge that all amounts payable to me as compensation hereunder will be subject to all required and customary withholding by Employer. Except for the Severance Payments expressly provided in this paragraph 1, I acknowledge and agree that I will not be entitled to receive any other severance payments. I understand that the Severance Payments represent, in part, consideration for signing this Employment Release and are not salary, wages or benefits to which I was already entitled. Subject to the express limitations of the Agreement, I understand and agree that I will not receive the Severance Payments unless I execute this Employment Release and do not revoke this Employment Release within the time period permitted hereafter or breach this Employment Release.

2. Except as provided in paragraph 4 below and for amounts owed to me for Annual Base Salary, accrued employee benefits and proper expense reimbursements prior to the date hereof and contingent upon receipt of the Severance Payments, I knowingly and voluntarily release and forever discharge the Company and the other Released Parties from any and all claims, controversies, actions, causes of action, cross-claims, counter-claims, demands, debts, accounts, covenants, contracts, agreements, compensatory damages, liquidated damages, punitive or exemplary damages, other damages, claims for costs and attorneys' fees, or liabilities of any nature whatsoever in law and in equity, and whether known or unknown, suspected, or claimed against the Company or any of the Released Parties which I, my spouse, or any of my heirs, executors, administrators or assigns, had, now has or may hereafter claim to have against the Released Parties, arising from the beginning of time to the date of this Release Agreement, which arise out of or are connected with my employment with, or my separation from, the Company (including, but not limited to, any allegation, claim or violation, arising under: Title VII

- 2 -

of the Civil Rights Act of 1964, as amended; the Civil Rights Act of 1991; the Age Discrimination in Employment Act of 1967, as amended (including the Older Workers Benefit Protection Act); the Equal Pay Act of 1963, as amended; the Americans with Disabilities Act of 1990; the Family and Medical Leave Act of 1993; the Civil Rights Act of 1866, as amended; the Worker Adjustment Retraining and Notification Act; the Employee Retirement Income Security Act of 1974; any applicable Executive Order Programs; the Fair Labor Standards Act; or their state or local counterparts; or under any other federal, state or local civil or human rights law, or under any other local, state, or federal law, regulation or ordinance; or under any public policy, contract or tort, or under common law; or arising under any policies, practices or procedures of the Company; or any claim for wrongful discharge, breach of contract, infliction of emotional distress, defamation; or any claim for costs, fees, or other expenses, including attorneys' fees incurred in these matters) (excluding any of the foregoing that relate to my position as a member and manager of Holdings or that arise pursuant to the Holdings LLC Agreement, that certain Registration Agreement, dated as of September 7, 2010, by and among Holdings, Flexpoint Fund, L.P., the Executive, Sukrit Agrawal, the Sukrit Agrawal Irrevocable Trust, dated December 31, 2009, the Akhil Agrawal Irrevocable Trust, dated December 31, 2009 and AMD Founders, LLC or that certain Unit Purchase Agreement, dated as of September 7, 2010, by and among Holdings, Flexpoint Fund, L.P., the Executive, Sukrit Agrawal, the Sukrit Agrawal Irrevocable Trust, dated December 31, 2009, the Akhil Agrawal Irrevocable Trust, dated December 31, 2009 and AMD Founders, LLC) (all of the foregoing collectively referred to herein as the "Claims").

3.   I represent that I have made no assignment or transfer of any right, claim, demand, cause of action, or other matter covered by paragraph 2 above.

4.   I agree that this Employment Release does not waive or release any rights or claims that I may have under the Age Discrimination in Employment Act of 1967 which arise after the date I execute this Employment Release. I acknowledge and agree that my separation from employment with the Company in compliance with the terms of the Agreement shall not serve as the basis for any claim or action (including, without limitation, any claim under the Age Discrimination in Employment Act of 1967).

5.   In signing this Employment Release, I acknowledge and intend that it shall be effective as a bar to each and every one of the Claims hereinabove mentioned. I expressly consent that this Employment Release shall be given full force and effect according to each and all of its express terms and provisions, as well as those relating to any other Claims hereinabove mentioned. I acknowledge and agree that this waiver is an essential and material term of this Employment Release and that without such waiver the Company would not have agreed to provide Severance Payments to Executive pursuant to the terms of the Agreement. I further agree that in the event I should bring a Claim seeking damages against the Company, or in the event I should seek to recover against the Company in any Claim brought by a governmental agency on my behalf, other than as specifically reserved in the Agreement, this Employment Release shall serve as a

Agrawal 000018

complete defense to such Claims. Notwithstanding the foregoing, I further acknowledge that I am not waiving and am not being required to waive any right that cannot be waived by law, including my right to file a charge or participate in an administrative investigation or proceeding; provided, however, that I hereby disclaim and waive any right to share or participate in any monetary award resulting from the prosecution of any such charge or investigation.

6. I agree that neither this Employment Release, nor the furnishing of the consideration for this Employment Release, shall be deemed or construed at any time to be an admission by the Company, any Released Party or myself of any improper or unlawful conduct.

7. I agree that I will forfeit all amounts payable by the Company pursuant to the Agreement if I challenge the validity of this Employment Release (but not if I challenge the scope of this Employment Release rather than the legal validity of the Employment Release). I also agree that if I violate this Employment Release by suing the Company or the other Released Parties asserting that the Employment Release is not valid (but not if I challenge the scope of this Employment Release rather than the legal validity of the Employment Release), I will pay all costs and expenses of defending against the suit incurred by the Released Parties, including reasonable attorneys' fees, and return all payments received by me pursuant to the Agreement.

8. This Employment Release is confidential and I agree not to disclose any information regarding the terms of this Employment Release, except to my immediate family, affiliates, representatives and any tax, legal or other counsel, as applicable, regarding the meaning or effect hereof or as required by law, and to instruct each of the foregoing not to disclose the same to anyone.

9. Any non-disclosure provision in this Employment Release does not prohibit or restrict me (or my attorney) from responding to any inquiry about this Employment Release or its underlying facts and circumstances by the Securities and Exchange Commission (SEC), the National Association of Securities Dealers, Inc. (NASD), any other self-regulatory organization or governmental entity.

10. Whenever possible, each provision of this Employment Release shall be interpreted in, such manner as to be effective and valid under applicable law, but if any provision of this Employment Release is held to be invalid, illegal or unenforceable in any respect under any applicable law or rule in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision or any other jurisdiction, but this Employment Release shall be reformed, construed and enforced in such jurisdiction as if such invalid, illegal or unenforceable provision had never been contained herein.

BY SIGNING THIS EMPLOYMENT RELEASE, I REPRESENT AND AGREE THAT:

(i) I HAVE READ IT CAREFULLY;

- 4 -

Agrawal 000019

(ii)    I UNDERSTAND ALL OF ITS TERMS AND KNOW THAT I AM GIVING UP IMPORTANT RIGHTS, INCLUDING BUT NOT LIMITED TO, RIGHTS UNDER THE AGE DISCRIMINATION IN EMPLOYMENT ACT OF 1967, AS AMENDED; TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, AS AMENDED; THE EQUAL PAY ACT OF 1963; THE AMERICANS WITH DISABILITIES ACT OF 1990; AND THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED;

(iii)    I VOLUNTARILY CONSENT TO EVERYTHING IN IT;

(iv)    I HAVE BEEN ADVISED TO CONSULT WITH AN ATTORNEY BEFORE EXECUTING IT AND I HAVE DONE SO OR, AFTER CAREFUL READING AND CONSIDERATION I HAVE CHOSEN NOT TO DO SO OF MY OWN VOLITION;

(v)    I HAVE ENTERED INTO THIS EMPLOYMENT RELEASE FREELY AND WITHOUT COERCION AND I HAVE BEEN GIVEN ALL TIME PERIODS REQUIRED BY LAW TO CONSIDER THIS EMPLOYMENT RELEASE, INCLUDING BUT NOT LIMITED TO THE 45-DAY PERIOD REQUIRED BY THE AGE DISCRIMINATION IN EMPLOYMENT ACT.  I UNDERSTAND THAT I MAY EXECUTE THIS EMPLOYMENT RELEASE LESS THAN 45 DAYS FROM MY RECEIPT FROM THE COMPANY, BUT AGREE THAT SUCH EXECUTION WILL REPRESENT MY KNOWING WAIVER OF SUCH 45-DAY CONSIDERATION PERIOD;

(vi)    I UNDERSTAND THAT I HAVE SEVEN (7) DAYS AFTER THE EXECUTION OF THIS RELEASE TO REVOKE IT AND THAT THIS RELEASE SHALL NOT BECOME EFFECTIVE OR ENFORCEABLE UNTIL THE REVOCATION PERIOD HAS EXPIRED;

(vii)    I HAVE SIGNED THIS EMPLOYMENT RELEASE KNOWINGLY AND VOLUNTARILY AND WITH THE ADVICE OF ANY COUNSEL RETAINED TO ADVISE ME WITH RESPECT TO IT; AND

(viii)    I AGREE THAT THE PROVISIONS OF THIS EMPLOYMENT RELEASE MAY NOT BE AMENDED, WAIVED, CHANGED OR MODIFIED EXCEPT BY AN INSTRUMENT IN WRITING SIGNED BY AN AUTHORIZED REPRESENTATIVE OF THE COMPANY AND BY ME.

DATE: _____       _____

                                   Akhil Agrawal

Agrawal 000020

CONFIDENTIAL

## AMENDMENT NO. 1 TO EMPLOYMENT AGREEMENT

This Amendment No. 1 (the "Amendment") to Employment Agreement, dated December 3, 2018 (the "Effective Date"), by and among American Purchasing Services, LLC, a Florida limited liability company (the "Company") and Akhil Agrawal ("Executive") is made pursuant to Section 6(j) of that certain Employment Agreement, dated September 7, 2010, by and among the Company and Executive (the "Agreement"). Unless otherwise defined herein, capitalized terms used in this Amendment shall have the meanings set forth in the Agreement.

WHEREAS, pursuant to Section 6(j) of the Agreement, the Agreement may be amended with the prior written consent of the Company, Executive and the Majority Flexpoint Ford Investors; and

WHEREAS, (a) the Company and Executive desire to amend the Agreement, effective as of the Effective Date and (b) there are no longer any Flexpoint Ford Investors.

NOW, THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.  Amendment.

(a)  The Preamble of the Agreement is hereby amended by deleting the phrase "Limited Liability Company Agreement of American Medical Depot Holdings, LLC ("Holdings"), dated as of August 30, 2010" and replacing such phrase with "Second Amended and Restated Limited Liability Company Agreement of American Medical Depot Holdings, LLC ("Holdings"), dated as of December 7, 2018".

(b)  In accordance with the revisions to the Agreement previously approved by the Board, effective as of the date hereof, Section 1(b)(i) of the Agreement is hereby amended by deleting the phrase "$200,000" and replacing such phase with "$509,975.29", which amount is the currently-existing and Board-approved compensation of Executive, and by deleting the phrase "Majority Flexpoint Ford Investors" and replacing such phrase with the phrase "Majority Wynnchurch Investors".

(c)  Section 1(b)(v) of the Agreement is hereby amended in its entirety as follows:

(v)  In addition to the Annual Base Salary, subject to terms and conditions established by the Board from time to time, the Executive shall receive an annual bonus (the "Annual Bonus"), payable within thirty (30) days following the completion of the Company's audit for each calendar year (beginning in calendar year 2019) during the Employment Period (but in any event during the calendar year following the calendar year to which such bonus applies), of (A) up to fifty percent (50%) of the Annual Base Salary based upon achievement by the Company and its Subsidiaries of the performance criteria and other goals established at the beginning of such fiscal year in writing by the Board, subject to the Required Consent ("Performance Goals"), and (B) up to one hundred percent (100%) of the Annual Base Salary based upon the Company and its Subsidiaries exceeding the Performance Goals by an amount that will be established at the beginning of such fiscal year in writing by the Board, subject to the Required Consent (the "Stretch Goals"). The Board and Executive shall agree upon the Performance Goals and the Stretch Goals for the Company and its Subsidiaries in conjunction with the approval of the annual budget for the Company. The parties agree that no Annual Bonus shall be payable with respect to the performance of the Company and its Subsidiaries in respect of calendar year 2018. Achievement of performance criteria and other goals may be

subject to confirmation by the Company's independent auditors.

(d)     Section 5 of the Agreement is hereby amended by deleting the notice address for notices to the Company and replacing such notice address as set forth below:

> "If to the Company:
>
> > American Purchasing Services, LL
> > 10315 USA Today Way
> > Miramar, FL 33025
> > Attn: Akhil Agrawal
> > Email:  Akhil.Agrawal@amdnext.com
>
> with copies to (which shall not constitute notice):
>
> > Wynnchurch Capital, LLC
> > 6250 N. River Road, Suite 10-100
> > Rosemont, Illinois 60018
> > Attn: John Hatherly
> > Email: jhatherly@wynnchurch.com
>
> > and
>
> > Perkins Coie LLP,
> > 131 South Dearborn Street, Suite 1700,
> > Chicago, Illinois 60603,
> > Attention: James Cruger,
> > Email Address: jcruger@perkinscoie.com"

(e)     Section 6(a) is hereby amended and restated in its entirety by the following:

> "(a)     Holdings LLC Agreement. To the extent of any conflict between this Agreement and the Holdings LLC Agreement, the terms of this Agreement are expressly subject to the Holdings LLC Agreement. The Company shall enforce the provisions of this Agreement in good faith and exercise all of its rights and remedies thereunder as appropriate and in the best interests of the Company and, without the prior written consent of the Majority Wynnchurch Investors, the Company shall not amend, modify or supplement, or waive any provisions of this Agreement."

(f)     Section 6(f) of the Agreement is hereby amended by deleting the phrase "Flexpoint Ford Investors" wherever such phrase appears in such section and replacing such phrase, in each case, with the phrase "Wynnchurch Investors".

(g)     Section 6(j) of the Agreement is hereby amended by deleting the phrase "Majority Flexpoint Ford Investors" and replacing such phrase with the phrase "Majority Wynnchurch Investors".

2.     Full Force and Effect.  Except as otherwise amended hereby, the terms and provisions of the Agreement shall remain in full force and effect and any conflict between the terms of the Agreement and this Amendment shall be construed in favor of this Amendment.

3.     Complete Agreement.  This Amendment and the Agreement expressly constitute the entire agreement among the parties hereto with respect to the subject matter hereof and preempt any prior

Agrawal 000022

understandings, agreements or representations by or among the parties, written or oral, which may have related to the subject matter hereof in any way. Other than this Amendment and the Agreement, neither the parties hereto nor any of their affiliates have entered into any other agreement or arrangement (including any other amendments to the Agreement or side letters related to the Agreement) related to the subject matter hereof.

4.     <u>Counterparts</u>.  This Amendment may be executed in several counterparts and all so executed shall constitute one and the same instrument, binding upon all of the parties hereto, notwithstanding that all parties are not signatory to the original or the same counterpart.  Facsimile or PDF transmission of an executed counterpart of this Amendment shall be deemed to constitute due and sufficient delivery of such counterpart, and such signatures shall be deemed original signatures for purposes of the enforcement and construction of this Amendment.

5.     <u>Governing Law</u>.  This Amendment shall be governed by and construed in accordance with the internal laws (and not the laws of conflicts) of the State of Delaware.

[signatures on the following page]

The undersigned have each executed this Amendment as of the date first written above.


**COMPANY:**

AMERICAN PURCHASING SERVICES, LLC

By: _____

Name: _____ Sukrit Agrawal

Its: CEO



Akhil Agrawal

EXECUTION

## EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT (this "Agreement") is made as of September 7, 2010, by and between American Purchasing Services, LLC, a Florida limited liability company (the "Company"), and Sukrit Agrawal (the "Executive"). This Agreement shall become effective as of the Employment Date (as defined below). Certain definitions are set forth in Section 4 of this Agreement. Capitalized terms used but not otherwise defined herein shall have the meaning set forth in the Limited Liability Company Agreement of American Medical Depot Holdings, LLC ("Holdings"), dated as of August 30, 2010 (the "Holdings LLC Agreement").

WHEREAS, the Company desires to continue to employ the Executive in the capacity and on the terms and conditions set forth herein, and the Executive desires to accept such employment in such capacity and on such terms and conditions; and

WHEREAS, the execution and delivery of this Agreement is a condition precedent to the closing of the transactions contemplated by that certain Unit Purchase Agreement, dated as of September 7, 2010, by and among Holdings, AMD Founders, LLC, a Florida limited liability company, the Executive, Akhil Agrawal, the Sukrit Agrawal Irrevocable Trust, dated December 31, 2009, the Akhil Agrawal Irrevocable Trust, dated December 31, 2009 and the Flexpoint Ford Investors, pursuant to which Flexpoint Ford Investors purchased an aggregate of 19,400,000 Class B Units and 19,400,000 Common Units from Holdings and AMD Founders;

NOW, THEREFORE, in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties to this Agreement hereby agree as follows:

1.      Employment. The Company agrees to employ the Executive and the Executive accepts such employment for the period (the "Employment Period") beginning as of the Employment Date and ending upon the date Executive ceases to be employed by the Company or any of its Subsidiaries for any reason (a "Separation").

(a)      Position and Duties.

(i)      During the Employment Period, the Executive shall serve as the Chief Executive Officer and shall have the normal duties, responsibilities and authority implied by such position, subject to the power of the Board to limit such duties, responsibilities and authority. The Company shall not assign the Executive, without his consent, duties that would be inconsistent with those of the Chief Executive Officer of the Company or those currently performed by the Executive.

(ii)      The Executive shall report to the Board, and the Executive shall devote his full business time and attention to the business and affairs of Holdings, the Company and their respective Subsidiaries.

16766394_21.DOC

(b)     Salary, Bonus and Benefits.

(i)     During the Employment Period, the Company shall pay the Executive an initial base salary of $200,000 per annum, as increased annually by the COLA Adjustment in Section 1(b)(ii). The Executive's annual base salary shall only be increased in addition to the COLA Adjustment with the consent of the Majority Flexpoint Ford Investors (the "Required Consent") (as adjusted from time to time, the "Annual Base Salary"). The Annual Base Salary shall be payable by the Company in regular installments in accordance with the Company's general payroll practices (in effect from time to time).

(ii)     For each fiscal year during the Employment Period, the Annual Base Salary payable for each such fiscal year, beginning with the fiscal year beginning January 1, 2011, shall be increased by the percentage increase in the Consumer Price Index for All Urban Consumers, U.S. City Average, for all items, during the immediately preceding year or, if the U.S. government ceases to publish such index, then by such index published by the U.S. government as is in the Board's judgment most similar to such index; provided that no such percentage increase shall be greater than seven percent (7%) nor less than one percent (1%) per year (the "COLA Adjustment"). During the Employment Period, the Executive may propose that the Annual Base Salary be adjusted to take into account various other factors, including (A) the consummation of acquisitions or other corporate transactions or the general increase in the Company's business that materially increase the duties or responsibilities of the Executive, (B) the performance of Holdings, the Company and their respective Subsidiaries and (C) industry surveys regarding compensation for executives of similarly situated companies (it being understood that the Executive shall have a target compensation at the seventy-fifth (75th) percentile of executives at such similarly situated companies); provided that no such proposal shall be effective without first obtaining the Required Consent.

(iii)     During the Employment Period, the Executive shall be entitled to four weeks of paid vacation each calendar year. Any unused vacation time shall carry over to the subsequent calendar but shall not carry over beyond the end of such subsequent calendar year. During the Employment Period, the Executive shall be entitled to as many holidays, sick days and personal days as are generally provided by the Company from time to time to its employees in accordance with the Company's policies as in effect from time to time.

(iv)     During the Employment Period, the Executive shall be entitled to participate in all of the Company's employee benefit programs for which senior executive employees of the Company and its Subsidiaries are generally eligible.

(v)     In addition to the Annual Base Salary, commencing with the calendar year ending December 31, 2010, the Executive shall receive an annual bonus (the "Annual Bonus"), payable within thirty (30) days following the completion of the Company's audit for each calendar year during the Employment Period (but in any event

Agrawal 000026

during the calendar year following the calendar year to which such bonus applies), of up to fifty percent (50%) of the Annual Base Salary, based upon achievement by the Company and its Subsidiaries of the performance criteria and other goals established at the beginning of the Employment Period or such fiscal year in writing by the Board, subject to the Required Consent, and which performance criteria and other goals may be subject to verification by the Company's independent auditors. The Board shall deliver such performance criteria and other goals for the Company and its Subsidiaries no later than thirty (30) days after the end of the prior fiscal year.

(vi)     During the Employment Period, the Company shall reimburse the Executive for all reasonable business expenses incurred by him in the course of performing his duties and responsibilities under this Agreement which are consistent with the Company's policies in effect from time to time with respect to travel, entertainment and other business expenses, subject to the Company's requirements with respect to reporting and documentation of such expenses.

(vii)     All amounts payable to the Executive as compensation hereunder shall be subject to all required and customary withholding by the Company.

(c)     Separation.  The Employment Period will terminate upon the earlier to occur of (i) the Executive's Disability or death, (ii) the Executive's termination of the Employment Period for any reason or (iii) the Company's termination of the Employment Period with or without Cause.

(i)     If the Executive's employment is terminated by the Company without Cause, by the Executive for Good Reason or as a result of the Executive's Disability or death, then the Executive, or the Executive's estate, shall be entitled to receive any portion of the Executive's Annual Base Salary owing as of the date of Separation, in each case payable in accordance with the Company's general payroll practices (as in effect on the date of the termination of the Executive's employment).

(ii)     In addition to the payments set forth in Section 1(c)(i), if the Executive's employment is terminated by the Company without Cause or by the Executive for Good Reason, then the Executive shall be entitled to receive his Annual Base Salary, payable by the Company in regular installments in accordance with the Company's general payroll practices (as in effect on the date of the termination of the Executive's employment), but in no event less frequently than monthly, during the eighteen-month period commencing on the date of termination of employment.

(iii)     Notwithstanding the foregoing, (A) the Executive shall not be entitled to receive any severance payments pursuant to Section 1(c)(ii) (the "Severance Payments") unless the Executive has executed and delivered to the Company a release in the form of Exhibit A attached hereto (the "Employment Release") within sixty (60) days of the Executive's termination of employment and such release is no longer subject to revocation and (B) the Executive shall be entitled to receive such severance payments

- 3 -

only so long as Executive has not materially breached the provisions of Sections 2 or 3 hereof, which if curable, was not cured within ten (10) days of delivery of written notice to the Executive.  The Severance Payments shall not be paid until the first scheduled payment date following the date the Employment Release is executed and no longer subject to revocation, with the first such payment being in an amount equal to the total amount to which the Executive would otherwise have been entitled during the period following the date of termination if such deferral had not been required; provided, however, that any such amounts that constitute nonqualified deferred compensation within the meaning of Internal Revenue Code Section 409A and the regulations and guidance promulgated thereunder ("Code Section 409A") shall not be paid until the sixtieth day following such termination to the extent necessary to avoid adverse tax consequences under Code Section 409A, and, if such payments are required to be so deferred, the first payment shall be in an amount equal to the total amount to which the Executive would otherwise have been entitled during the period following the date of termination if such deferral had not been required.  Except as otherwise expressly provided in this Section 1(c), the Executive shall not be entitled to receive any severance payments from and after the date of termination.

        2.      Confidential Information.

        (a)      Obligation to Maintain Confidentiality.  The Executive acknowledges that the information, observations and data (including trade secrets) obtained by him during the course of his performance under this Agreement concerning the business or affairs of Holdings, the Company and any of their respective Subsidiaries ("Confidential Information") are the property of Holdings, the Company or such Subsidiaries, including information concerning acquisition opportunities in or reasonably related to the Company's business or industry of which the Executive becomes aware during the Employment Period.  Without limiting the foregoing, the Executive acknowledges and agrees that "Confidential Information" includes: (i) information relating to Holdings', the Company's and their respective Subsidiaries' proprietary ideas and products, current and planned business, marketing and distribution methods and techniques, cost and pricing of Holdings', the Company's and their respective Subsidiaries' products and services, lists of Holdings', the Company's and their respective Subsidiaries' past, present and prospective licensees, distributors, customers, suppliers, vendors, lenders, independent contractors and employees, including their names, current and anticipated customer requirements, market studies, business plans, proprietary computer software (including object code and source code), database technologies, and any other similar or related information, (ii) information concerning the business and affairs of Holdings, the Company and their respective Subsidiaries (which includes historical financial statements, financial projections and budgets, historical and projected revenues, capital spending budgets and plans, the names of key personnel and personnel training techniques and materials) and (iii) notes, analyses, compilations, studies, summaries, and other material prepared by or for Holdings, the Company and their respective Subsidiaries containing or based, in whole or in part, on any such information; provided, however, that the "Confidential Information" shall not include information that was, is now, or becomes generally available to the public (but not as a result of a breach of any duty of

- 4 -

Agrawal 000028

confidentiality by which the Executive is bound or by a breach of any duty of confidentiality by which a third party is bound and of which the Executive is aware).  Therefore, the Executive agrees that he will not disclose to any unauthorized Person or use for his own account any Confidential Information without the Board's written consent, unless and to the extent that the Confidential Information is (i) required to be disclosed pursuant to any applicable law or court order or (ii) disclosed by the Executive in the ordinary course of the Company's business as a proper part of his employment for the benefit of the Company or its Subsidiaries in connection with communications with customers, vendors and other proper parties.  Upon request of the Board, the Executive shall deliver to the Company at a Separation, or at any other time following a Separation, all memoranda, notes, plans, records, reports, computer tapes, printouts and software and other documents and data (and copies thereof) relating to the Confidential Information, Work Product (as defined below) or the business of Holdings, the Company and any of their respective Subsidiaries (including, without limitation, all acquisition prospects, lists and contact information) which he may then possess or have under his control.

(b)     Ownership of Property.  The Executive acknowledges that all discoveries, concepts, ideas, inventions, innovations, improvements, developments, methods, processes, programs, designs, analyses, drawings, reports, patent applications, copyrightable work and mask work (whether or not including any confidential information) and all registrations or applications related thereto, all other proprietary information and all similar or related information (whether or not patentable) that relate to Holdings', the Company's or any of their respective Subsidiaries' actual or planned business, research and development, or existing or planned future products or services and that are conceived, developed, contributed to, made, or reduced to practice by the Executive (either solely or jointly with others) pursuant to his employment (whether before or after the date hereof) by Holdings, the Company or any of their respective Subsidiaries (including any of the foregoing that constitutes any proprietary information or records) ("Work Product") belong to Holdings, the Company or such Subsidiary and the Executive hereby assigns, and agrees to assign, all such Work Product to Holdings, the Company or to such Subsidiary.  Any copyrightable work prepared in whole or in part by the Executive in the course of his work for any of the foregoing entities shall be deemed a "work made for hire" under the copyright laws, and Holdings, the Company or such Subsidiary shall own all rights therein.  To the extent that any such copyrightable work is not a "work made for hire," the Executive hereby assigns and agrees to assign to Holdings, the Company or such Subsidiary all right, title, and interest, including without limitation, copyright in and to such copyrightable work.  At the request of the Board, the Executive shall promptly disclose such Work Product and copyrightable work to the Board and perform all actions reasonably requested by the Board to establish and confirm Holdings', the Company's or such Subsidiary's ownership (including, without limitation, assignments, consents, powers of attorney, and other instruments).

(c)     Third-Party Information. The Executive understands that Holdings, the Company and their respective Subsidiaries will receive from third parties confidential or proprietary information ("Third-Party Information") subject to a duty on Holdings', the Company's and their respective Subsidiaries' part to maintain the confidentiality of such information and to use it only for certain limited purposes.  During the Employment Period and

- 5 -

Agrawal 000029

thereafter, and without in any way limiting the provisions of <u>Section 2(a)</u> above, the Executive will hold Third-Party Information confidentially in accordance with any confidentiality agreement executed by Holdings, the Company or any of their Subsidiaries, or at a minimum, the Company's policies regarding such materials.

      3.   <u>Noncompetition and Nonsolicitation</u>.  The Executive acknowledges that in the course of his employment with the Company he will become familiar with Holdings', the Company's and its Subsidiaries' trade secrets and with other Confidential Information concerning Holdings, the Company and such Subsidiaries and that his services will be of special, unique and extraordinary value to Holdings, the Company and such Subsidiaries.  Therefore, the Executive agrees that:

      (a)   <u>Noncompetition</u>.  During the Employment Period and for a period of two (2) years thereafter, the Executive shall not directly or indirectly, anywhere in the United States, its territories and the Caribbean, directly or indirectly own, manage, control, participate in, consult with, render services for, or in any manner engage in any business competing with the businesses of Holdings, the Company or any of their respective Subsidiaries.  Nothing herein shall prohibit the Executive from being a passive owner of not more than five percent (5%) of the outstanding stock of any class of a corporation that is publicly traded, so long as the Executive has no active participation in the business of such corporation.

      (b)   <u>Nonsolicitation</u>.  During the Employment Period and for a period of one (1) year thereafter, Executive shall not directly or indirectly through another entity (i) induce or attempt to induce any employee or independent contractor of Holdings, the Company or their respective Subsidiaries to leave the employ of, or terminate the independent contractor relationship with, Holdings, the Company or such Subsidiary, or in any way intentionally and materially interfere with the relationship between Holdings, the Company and any of their respective Subsidiaries and any employee or independent contractor thereof, (ii) hire any person who was an employee of Holdings, the Company or any of their respective Subsidiaries within 180 days after such person ceased to be an employee of Holdings, the Company or any of their respective Subsidiaries, (iii) induce or attempt to induce any customer, supplier, licensee or other business relation of Holdings, the Company or any of their respective Subsidiaries to cease or decrease doing business with Holdings, the Company or such Subsidiary or in any way intentionally and materially interfere with the relationship between any such customer, supplier, licensee or business relation and Holdings, the Company and any Subsidiary or (iv) directly or indirectly acquire or attempt to acquire an interest in any business relating to the business of Holdings, the Company or any of their respective Subsidiaries and with which Holdings, the Company and any of their respective Subsidiaries has, to the knowledge of the Executive, entertained discussions or has requested and received information relating to the acquisition of such business by Holdings, the Company or any of their respective Subsidiaries in the one (1) year period immediately preceding a Separation.

      (c)   <u>Enforcement</u>.  If, at the time of enforcement of <u>Section 2</u> or this <u>Section 3</u>, a court holds that the restrictions stated herein are unreasonable under circumstances then existing, the parties hereto agree that the maximum duration, scope or geographical area

- 6 -

reasonable under such circumstances shall be substituted for the stated period, scope or area and that the court shall be allowed to revise the restrictions contained herein to cover the maximum duration, scope and area permitted by law.  Because the Executive's services are unique and because the Executive has access to confidential information, the parties hereto agree that money damages would be an inadequate remedy for any breach of this Agreement.  Therefore, in the event a breach or threatened breach of this Agreement, Holdings, the Company, their respective Subsidiaries may, in addition to other rights and remedies existing in their favor, apply to any court of competent jurisdiction for specific performance and/or injunctive or other relief in order to enforce, or prevent any violations of, the provisions hereof (without posting a bond or other security).  Executive shall pay all costs, attorneys' fees and other expenses, paid or incurred by Holdings, the Company or their respective Subsidiaries, in enforcing Section 2 or this Section 3, whether such costs, attorneys' fees and other expenses are incurred prior to suit or after institution of suit, including any appeals.

(d)     Additional Acknowledgments.   The Executive acknowledges that the provisions of this Section 3 are in consideration of:  (i) employment with the Company, (ii) the acquisition of Class B Units from an Affiliate of Executive by the Flexpoint Ford Investors and (iii) additional good and valuable consideration as set forth in this Agreement.  In addition, the Executive agrees and acknowledges that the restrictions contained in Section 2 or this Section 3 do not preclude the Executive from earning a livelihood, nor do they unreasonably impose limitations on Executive's ability to earn a living.  The Executive acknowledges (i) that the business of Holdings, the Company and their respective Subsidiaries will be conducted throughout the United States, its territories and the Caribbean, (ii) notwithstanding the state of incorporation or principal office of Holdings, the Company or any of their respective Subsidiaries, it is expected that Holdings, the Company and their respective Subsidiaries will have business activities and have valuable business relationships within its industry throughout the United States, its territories and the Caribbean and (iii) as part of his responsibilities, Executive will be traveling throughout the United States, and may be traveling elsewhere in the United States, its territories and the Caribbean, in furtherance of Holdings', the Company's and their respective Subsidiaries' business and their relationships.   The Executive agrees and acknowledges that the potential harm to Holdings, the Company and their respective Subsidiaries of the non-enforcement of Section 2 or this Section 3 outweighs any potential harm to the Executive of its enforcement by injunction or otherwise.  The Executive acknowledges that he has carefully read this Agreement and has given careful consideration to the restraints imposed upon the Executive by this Agreement, and is in full accord as to their necessity for the reasonable and proper protection of confidential and proprietary information of Holdings, the Company and their respective Subsidiaries now existing or to be developed in the future.  The Executive expressly acknowledges and agrees that each and every restraint imposed by this Agreement is reasonable with respect to subject matter, time period and geographical area.

Agrawal 000031

## GENERAL PROVISIONS

4.      Definitions.

"Affiliate" of any particular Person means any other Person controlling, controlled by or under common control with such particular Person, where "control" means the possession, directly or indirectly, of the power to direct the management and policies of a Person whether through the ownership of voting securities, by contract or otherwise, and such "control" will be presumed if any Person owns ten percent (10%) or more of the voting capital stock or other Equity Interests, directly or indirectly, of any other Person.

"Annual Base Salary" has the meaning set forth in Section 1(b)(i).

"Board" means the Company's board of managers.

"Cause" means (i) the conviction of, or entry of a plea of guilty or nolo contendere, to a felony (excluding traffic offenses) or any crime involving dishonesty, breach of trust or fraud with respect to Holdings, the Company or any of their respective Subsidiaries or any of their customers or suppliers or stockholders, (ii) repeatedly reporting to work under the influence of alcohol or illegal drugs causing Holdings, the Company or any of their respective Subsidiaries substantial public disgrace or disrepute or substantial economic harm, or clinical dependence upon the use or consumption of alcohol or any other legal drug or chemical substance that is not prescribed by a board certified medical doctor or psychiatrist, (iii) willful and continued failure to substantially perform duties of the office held by the Executive as reasonably directed by the Board or willful and continued refusal or failure to act in accordance with any specific, lawful direction or order of the Board, each after (x) written demand for substantial performance is delivered by the Company specifically identifying the manner in which the Company believes the Executive has not substantially performed such duties and (y) if curable, the Executive has failed to substantially comply with such written demand within thirty (30) days after his receipt thereof, (iv) continued unfitness or unavailability for service (other than as a result of death or Disability) for a period of ten (10) business days after the Executive's receipt of notice from the Company identifying such deficiencies, or (v) any material breach of Section 2 or Section 3 of this Agreement by the Executive.

"Code Section 409A" has the meaning set forth in Section 1(c)(iii).

"COLA Adjustment" has the meaning set forth in Section 1(b)(ii).

"Confidential Information" has the meaning set forth in Section 2(a).

"Disability" means the disability of the Executive caused by any physical or mental injury, illness or incapacity as a result of which the Executive is unable to effectively perform the essential functions of the Executive's duties as determined by the Company's disability insurance policy.

- 8 -

Agrawal 000032

"<u>Employment Date</u>" means the date hereof.

"<u>Employment Period</u>" has the meaning set forth in <u>Section 1</u>.

"<u>Employment Release</u>" has the meaning set forth in <u>Section 1(c)(iii)</u>.

"<u>Executive</u>" has the meaning set forth in the Preamble.

"<u>Holdings</u>" has the meaning set forth in the Preamble.

"<u>Holdings LLC Agreement</u>" has the meaning set forth in the Preamble.

"<u>Good Reason</u>" means, at any time when the Founders and their Family Groups no longer collectively have appointed or have the right to appoint a majority of the managers to the Board, (i) a change in the Executive's principal office to a location outside a twenty-five (25) mile radius of the Executive's principal office on the date hereof without the express consent of the Executive; (ii) a material breach of this Agreement by the Company; (iii) a material diminution in the Executive's authority, duties or responsibilities, other than as reasonably required by a change in the business of Holdings, the Company and their respective Subsidiaries; (iv) a reduction in the Executive's Annual Base Salary as the same may be increased from time to time; or (v) a requirement for the Executive to be supervised and directed by anyone other than the Board; <u>provided</u>, in each case, that if curable, the Company has failed to substantially cure such condition within thirty (30) days after receipt of written notice thereof from the Executive.

"<u>Person</u>" means a natural person, a partnership, a limited liability company, a corporation, a joint stock company, a trust, a joint venture, investment fund, any other business entity and a governmental entity or any department, agency or political subdivision thereof.

"<u>Required Consent</u>" has the meaning set forth in <u>Section 1(b)(i)</u>.

"<u>Separation</u>" has the meaning set forth in <u>Section 1</u>.

"<u>Severance Payments</u>" has the meaning set forth in <u>Section 1(c)(ii)</u>.

"<u>Subsidiary</u>" means, with respect to any Person, any corporation, limited liability company, partnership, association or other business entity of which (i) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers, or trustees thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof, or (ii) if a limited liability company, partnership, joint venture, association or other business entity (other than a corporation), a majority of membership, partnership or other similar ownership interest thereof or the power to elect or appoint a majority of the managers or governing body thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof; <u>provided that</u> Allied Joint Venture, LLC and Alliance Joint Venture, Inc. shall be deemed Subsidiaries of the Company for purposes of this Agreement. For

- 9 -

purposes hereof, and without limitation, a Person or Persons shall be deemed to have a majority ownership interest in a limited liability company, partnership, association or other business entity (other than a corporation) if such Person or Persons shall be allocated a majority of limited liability company, partnership, association, or other business entity gains or losses or shall be or control the sole, or a majority of the, managing director(s), managing member(s), manager(s), board of manager(s) or general partner of such limited liability company, partnership, association or other business entity.

"Third-Party Information" has the meaning set forth in Section 2(c).

"Work Product" has the meaning set forth in Section 2(b).

5.   Notices.   All notices, requests, demands and other communications permitted or required to be given or delivered under or by reason of the provisions of this Agreement shall be in writing and shall be deemed conclusively to have been given (i) when personally delivered, (ii) when sent by facsimile (with hard copy to follow) during a business day (or on the next business day if sent after the close of normal business hours or on any non-business day), (iii) when sent by electronic mail (with hard copy to follow) during a business day (or on the next business day if sent after the close of normal business hours or on any non-business day), (iv) one business day after being sent by reputable overnight express courier (charges prepaid), or (v) three business days following mailing by certified or registered mail, postage prepaid and return receipt requested.   Unless another address is specified in writing, notices, requests, demands and communications to the parties shall be sent to the addresses indicated below:

If to the Company:

American Purchasing Services, LLC
4380 NW 135th Street
Opa Locka, FL 33064
Attention:  President
Telephone: (305) 364-0888
Facsimile:  (305) 364-0877

with copies to (which shall not constitute notice):

Flexpoint Ford, LLC
676 N. Michigan Ave., Suite 3300
Chicago, Illinois  60611
Attention:      Ethan A. Budin
                Jonathan T. Oka
Telephone: (312) 327-4520
Facsimile: (312) 327-4525

- 10 -

Agrawal 000034

Kirkland & Ellis LLP
300 N. LaSalle Street
Chicago, Illinois  60654
Attention:      Sanford E. Perl, P.C.
                Jeffrey A. Fine, P.C.
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

If to the Executive:

Sukrit Agrawal
4380 NW 135th Street
Opa Locka, Florida 33064
Telephone: (305) 364-0888
Facsimile: (305) 364-0877

or such other address or to the attention of such other Person as the recipient party shall have specified by prior written notice to the sending party.  Any notice under this Agreement will be deemed to have been given when so delivered or sent or, if mailed, 5 days after deposit in the U.S. mail.

6.      General Provisions.

(a)      Investor Rights Agreement. To the extent of any conflict between this Agreement and the Investor Rights Agreement, the terms of this Agreement are expressly subject to the Investor Rights Agreement. The Company shall enforce the provisions of this Agreement in good faith and exercise all of its rights and remedies thereunder as appropriate and in the best interests of the Company and, without the prior written consent of the Majority Flexpoint Ford Investors, the Company shall not amend, modify or supplement, or waive any provisions of this Agreement.

(b)      Severability.  Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under any applicable law or rule in any jurisdiction, such invalidity, illegality or unenforceability will not affect any other provision or any other jurisdiction, but this Agreement will be reformed, construed and enforced in such jurisdiction as if such invalid, illegal or unenforceable provision had never been contained herein.

(c)      Complete Agreement.   This Agreement, those documents expressly referred to herein and other documents of even date herewith embody the complete agreement and understanding among the parties and supersede and preempt any prior understandings, agreements or representations by or among the parties, written or oral, which may have related to the subject matter hereof in any way.

- 11 -

(d)    <u>No Strict Construction</u>.  The language used in this Agreement shall be deemed to be the language chosen by the parties hereto to express their mutual intent, and no rule of strict construction shall be applied against any party.

(e)    <u>Counterparts</u>.  This Agreement may be executed in separate counterparts (including by means of facsimile), each of which is deemed to be an original and all of which taken together constitute one and the same agreement.

(f)    <u>Successors and Assigns</u>.  Except as otherwise provided herein, this Agreement shall bind and inure to the benefit of and be enforceable by Executive and the Company; <u>provided</u> that the rights and obligations of the Executive and the Company under this Agreement shall not be assignable.  Any provision hereof requiring the consent of the Flexpoint Ford Investors or otherwise granting any rights to the Flexpoint Ford Investors shall inure to the benefit of and be enforceable by the Flexpoint Ford Investors and their respective successors and assigns that are permitted under the Holdings LLC Agreement.

(g)    <u>Choice of Law</u>.  All questions concerning the construction, validity and interpretation of this Agreement and the exhibits hereto will be governed by and construed in accordance with the internal laws of the State of Florida, without giving effect to any choice of law or conflict of law provision or rule (whether of the State of Florida or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Florida.

(h)    <u>MUTUAL WAIVER OF JURY TRIAL</u>.  BECAUSE DISPUTES ARISING IN CONNECTION WITH COMPLEX TRANSACTIONS ARE MOST QUICKLY AND ECONOMICALLY RESOLVED BY AN EXPERIENCED AND EXPERT PERSON AND THE PARTIES WISH STATE OF FLORIDA AND FEDERAL LAWS TO APPLY (RATHER THAN ARBITRATION RULES), THE PARTIES DESIRE THAT THEIR DISPUTES BE RESOLVED BY A JUDGE APPLYING SUCH APPLICABLE LAWS.  THEREFORE, TO ACHIEVE THE BEST COMBINATION OF THE BENEFITS OF THE JUDICIAL SYSTEM AND OF ARBITRATION, EACH PARTY TO THIS AGREEMENT HEREBY WAIVES ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, SUIT, OR PROCEEDING BROUGHT TO RESOLVE ANY DISPUTE BETWEEN OR AMONG ANY OF THE PARTIES HERETO, WHETHER ARISING IN CONTRACT, TORT, OR OTHERWISE, ARISING OUT OF, CONNECTED WITH, RELATED OR INCIDENTAL TO THIS AGREEMENT, THE TRANSACTIONS CONTEMPLATED HEREBY AND/OR THE RELATIONSHIP ESTABLISHED AMONG THE PARTIES HEREUNDER.

(i)    <u>Remedies</u>.  Each of the parties to this Agreement will be entitled to enforce its rights under this Agreement specifically, to recover damages and costs (including attorney's fees) caused by any breach of any provision of this Agreement and to exercise all other rights existing in its favor.  The parties hereto agree and acknowledge that money damages may not be an adequate remedy for any breach of the provisions of this Agreement and that any party may in its sole discretion apply to any court of law or equity of competent jurisdiction (without posting any bond or deposit) for specific performance and/or other injunctive relief in order to enforce or prevent any violations of the provisions of this Agreement.

Agrawal 000036

(j)     Amendment and Waiver.   The provisions of this Agreement may be amended, supplemented and waived only with the prior written consent of the Company, the Executive and the Majority Flexpoint Ford Investors.

(k)     Indemnification and Reimbursement of Payments on Behalf of Executive. Holdings, the Company and their respective Subsidiaries shall be entitled to deduct or withhold from any amounts owing from Holdings, the Company or any of their respective Subsidiaries to Executive any federal, state, local or foreign withholding taxes, excise taxes, or employment taxes ("Taxes") imposed with respect to Executive's compensation (including wages and bonuses). In the event Holdings, the Company or their respective Subsidiaries does not make such deductions or withholdings, Executive shall indemnify Holdings, the Company and their respective Subsidiaries for any amounts paid with respect to any such Taxes, together with any interest, penalties and related expenses thereto.

(l)     The Executive's Representations.   The Executive hereby represents and warrants to the Company that (i) the execution, delivery and performance of this Agreement by the Executive do not and shall not conflict with, breach, violate or cause a default under any contract, agreement, instrument, order, judgment or decree to which the Executive is a party or by which he is bound, (ii) the Executive is not a party to or bound by any employment agreement, consulting agreement, noncompete agreement, non-solicitation agreement or confidentiality agreement with any other person or entity that conflicts with this Agreement or could reasonably be expected to affect the Executive's ability to satisfy his duties to Holdings, the Company or any of their respective Subsidiaries, and (iii) upon the execution and delivery of this Agreement by the Company, this Agreement shall be the valid and binding obligation of the Executive, enforceable in accordance with its terms. The Executive acknowledges and agrees that no provision contained herein shall entitle the Executive to remain in the employment of Holdings, the Company or any of their respective Subsidiaries or affect the right of Holdings, the Company or any of their respective Subsidiaries to terminate the Executive's employment at any time for any reason. The Executive hereby acknowledges and represents that he has consulted with independent legal counsel regarding his rights and obligations under this Agreement and that he fully understands the terms and conditions contained herein.

(m)     Termination.  This Agreement (except for the provisions of Sections 1(a) and 1(b)) shall survive a Separation and shall remain in full force and effect after such Separation.

(n)     No Third-Party Beneficiaries.   Except as specifically provided in this Agreement and for the estate of the Executive in the event of his death, nothing herein expressed or implied is intended or shall be construed to confer upon or give to any Person other than the parties hereto and their respective permitted successors and assigns, any rights or remedies under or by reason of this Agreement, such third parties specifically including employees and creditors of the Company.

- 13 -

(o)    Code Section 409A Compliance.

(i)    The intent of the parties is that payments and benefits under this Agreement comply with Code Section 409A and, accordingly, to the maximum extent permitted, this Agreement shall be interpreted to be in compliance therewith. In no event whatsoever shall the Company be liable for any additional tax, interest or penalty that may be imposed on the Executive by Code Section 409A or damages for failing to comply with Code Section 409A.

(ii)    A termination of employment shall not be deemed to have occurred for purposes of any provision of this Agreement providing for the payment of any amounts or benefits upon or following a termination of employment unless such termination is also a "separation from service" within the meaning of Code Section 409A and, for purposes of any such provision of this Agreement, references to a "termination," "termination of employment" or like terms shall mean "separation from service." Notwithstanding anything to the contrary in this Agreement, if the Executive is deemed on the date of termination to be a "specified executive" within the meaning of that term under Code Section 409A(a)(2)(B), then with regard to any payment or the provision of any benefit that is considered deferred compensation under Code Section 409A payable on account of a "separation from service," such payment or benefit shall not be made or provided until the date which is the earlier of (A) the expiration of the six (6)-month period measured from the date of such "separation from service" of the Executive, and (B) the date of the Executive's death, to the extent required under Code Section 409A. Upon the expiration of the foregoing delay period, all payments and benefits delayed pursuant to this Section 6(o) (whether they would have otherwise been payable in a single sum or in installments in the absence of such delay) shall be paid or reimbursed to the Executive in a lump sum, and any remaining payments and benefits due under this Agreement shall be paid or provided in accordance with the normal payment dates specified for them herein.

(iii)    To the extent that reimbursements or other in-kind benefits under this Agreement constitute "nonqualified deferred compensation" for purposes of Code Section 409A, (A) all such expenses or other reimbursements hereunder shall be made on or prior to the last day of the taxable year following the taxable year in which such expenses were incurred by the Executive, (B) any right to such reimbursement or in-kind benefits shall not be subject to liquidation or exchange for another benefit, and (C) no such reimbursement, expenses eligible for reimbursement, or in-kind benefits provided in any taxable year shall in any way affect the expenses eligible for reimbursement, or in-kind benefits to be provided, in any other taxable year.

(iv)    For purposes of Code Section 409A, the Executive's right to receive any installment payments pursuant to this Agreement shall be treated as a right to receive a series of separate and distinct payments.

- 14 -

Agrawal 000038

(v)     Notwithstanding any other provision of this Agreement to the contrary, in no event shall any payment under this Agreement that constitutes "nonqualified deferred compensation" for purposes of Code Section 409A be subject to offset by any other amount unless otherwise permitted by Code Section 409A.

\*   \*   \*   \*   \*

- 15 -

Agrawal 000039

IN WITNESS WHEREOF, the parties hereto have executed this Employment Agreement on the date first written above.

AMERICAN PURCHASING SERVICES, LLC

By:

Name: Sukrit A Grawal

Its: Chief Executive Officer

Sukrit Agrawal

Exhibit A

## EMPLOYMENT RELEASE

I, Sukrit Agrawal, in consideration of the payment of the Severance Payments (as defined herein) by American Purchasing Services, LLC, a Florida limited liability company ("Employer") pursuant to the Employment Agreement, dated as of September 7, 2010 (the "Agreement"), do hereby release and forever discharge as of the date hereof Employer and its subsidiaries, parents, and affiliates, together with each of their current and former principals, directors, managers, officers, agents, shareholders, representatives, employees, and each of their heirs, executors, successors and assigns (collectively, the "Released Parties") to the extent provided below.

1.  I acknowledge that subject to (i) my execution and non-revocation of this Employment Release and (ii) the express limitations of the Agreement, during the eighteen-month period commencing on the date of my separation from employment with the Employer and its subsidiaries (collectively, the "Company"), I will be entitled to receive my Annual Base Salary of $[_____] consistent with Employer's past practice (collectively, the "Severance Payments"), payable by Employer in regular installments in accordance with Employer's general payroll practices (in effect from time to time). I acknowledge that all amounts payable to me as compensation hereunder will be subject to all required and customary withholding by Employer. Except for the Severance Payments expressly provided in this paragraph 1, I acknowledge and agree that I will not be entitled to receive any other severance payments. I understand that the Severance Payments represent, in part, consideration for signing this Employment Release and are not salary, wages or benefits to which I was already entitled. Subject to the express limitations of the Agreement, I understand and agree that I will not receive the Severance Payments unless I execute this Employment Release and do not revoke this Employment Release within the time period permitted hereafter or breach this Employment Release.

2.  Except as provided in paragraph 4 below and for amounts owed to me for Annual Base Salary, accrued employee benefits and proper expense reimbursements prior to the date hereof and contingent upon receipt of the Severance Payments, I knowingly and voluntarily release and forever discharge the Company and the other Released Parties from any and all claims, controversies, actions, causes of action, cross-claims, counter-claims, demands, debts, accounts, covenants, contracts, agreements, compensatory damages, liquidated damages, punitive or exemplary damages, other damages, claims for costs and attorneys' fees, or liabilities of any nature whatsoever in law and in equity, and whether known or unknown, suspected, or claimed against the Company or any of the Released Parties which I, my spouse, or any of my heirs, executors, administrators or assigns, had, now has or may hereafter claim to have against the Released Parties, arising from the beginning of time to the date of this Release Agreement, which arise out of or are connected with my employment with, or my separation from, the Company (including, but not limited to, any allegation, claim or violation, arising under: Title VII

- 2 -

of the Civil Rights Act of 1964, as amended; the Civil Rights Act of 1991; the Age Discrimination in Employment Act of 1967, as amended (including the Older Workers Benefit Protection Act); the Equal Pay Act of 1963, as amended; the Americans with Disabilities Act of 1990; the Family and Medical Leave Act of 1993; the Civil Rights Act of 1866, as amended; the Worker Adjustment Retraining and Notification Act; the Employee Retirement Income Security Act of 1974; any applicable Executive Order Programs; the Fair Labor Standards Act; or their state or local counterparts; or under any other federal, state or local civil or human rights law, or under any other local, state, or federal law, regulation or ordinance; or under any public policy, contract or tort, or under common law; or arising under any policies, practices or procedures of the Company; or any claim for wrongful discharge, breach of contract, infliction of emotional distress, defamation; or any claim for costs, fees, or other expenses, including attorneys' fees incurred in these matters) (excluding any of the foregoing that relate to my position as a member and manager of Holdings or that arise pursuant to the Holdings LLC Agreement, that certain Registration Agreement, dated as of September 7, 2010, by and among Holdings, Flexpoint Fund, L.P., the Executive, Akhil Agrawal, the Sukrit Agrawal Irrevocable Trust, dated December 31, 2009, the Akhil Agrawal Irrevocable Trust, dated December 31, 2009 and AMD Founders, LLC or that certain Unit Purchase Agreement, dated as of September 7, 2010, by and among Holdings, Flexpoint Fund, L.P., the Executive, Akhil Agrawal, the Sukrit Agrawal Irrevocable Trust, dated December 31, 2009, the Akhil Agrawal Irrevocable Trust, dated December 31, 2009 and AMD Founders, LLC) (all of the foregoing collectively referred to herein as the "Claims").

3.  I represent that I have made no assignment or transfer of any right, claim, demand, cause of action, or other matter covered by paragraph 2 above.

4.  I agree that this Employment Release does not waive or release any rights or claims that I may have under the Age Discrimination in Employment Act of 1967 which arise after the date I execute this Employment Release. I acknowledge and agree that my separation from employment with the Company in compliance with the terms of the Agreement shall not serve as the basis for any claim or action (including, without limitation, any claim under the Age Discrimination in Employment Act of 1967).

5.  In signing this Employment Release, I acknowledge and intend that it shall be effective as a bar to each and every one of the Claims hereinabove mentioned. I expressly consent that this Employment Release shall be given full force and effect according to each and all of its express terms and provisions, as well as those relating to any other Claims hereinabove mentioned. I acknowledge and agree that this waiver is an essential and material term of this Employment Release and that without such waiver the Company would not have agreed to provide Severance Payments to Executive pursuant to the terms of the Agreement.  I further agree that in the event I should bring a Claim seeking damages against the Company, or in the event I should seek to recover against the Company in any Claim brought by a governmental agency on my behalf, other than as specifically reserved in the Agreement, this Employment Release shall serve as a

Agrawal 000042

complete defense to such Claims. Notwithstanding the foregoing, I further acknowledge that I am not waiving and am not being required to waive any right that cannot be waived by law, including my right to file a charge or participate in an administrative investigation or proceeding; provided, however, that I hereby disclaim and waive any right to share or participate in any monetary award resulting from the prosecution of any such charge or investigation.

6.    I agree that neither this Employment Release, nor the furnishing of the consideration for this Employment Release, shall be deemed or construed at any time to be an admission by the Company, any Released Party or myself of any improper or unlawful conduct.

7.    I agree that I will forfeit all amounts payable by the Company pursuant to the Agreement if I challenge the validity of this Employment Release (but not if I challenge the scope of this Employment Release rather than the legal validity of the Employment Release). I also agree that if I violate this Employment Release by suing the Company or the other Released Parties asserting that the Employment Release is not valid (but not if I challenge the scope of this Employment Release rather than the legal validity of the Employment Release), I will pay all costs and expenses of defending against the suit incurred by the Released Parties, including reasonable attorneys' fees, and return all payments received by me pursuant to the Agreement.

8.    This Employment Release is confidential and I agree not to disclose any information regarding the terms of this Employment Release, except to my immediate family, affiliates, representatives and any tax, legal or other counsel, as applicable, regarding the meaning or effect hereof or as required by law, and to instruct each of the foregoing not to disclose the same to anyone.

9.    Any non-disclosure provision in this Employment Release does not prohibit or restrict me (or my attorney) from responding to any inquiry about this Employment Release or its underlying facts and circumstances by the Securities and Exchange Commission (SEC), the National Association of Securities Dealers, Inc. (NASD), any other self-regulatory organization or governmental entity.

10.    Whenever possible, each provision of this Employment Release shall be interpreted in, such manner as to be effective and valid under applicable law, but if any provision of this Employment Release is held to be invalid, illegal or unenforceable in any respect under any applicable law or rule in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision or any other jurisdiction, but this Employment Release shall be reformed, construed and enforced in such jurisdiction as if such invalid, illegal or unenforceable provision had never been contained herein.

BY SIGNING THIS EMPLOYMENT RELEASE, I REPRESENT AND AGREE THAT:

(i)    I HAVE READ IT CAREFULLY;

- 4 -

(ii)    I UNDERSTAND ALL OF ITS TERMS AND KNOW THAT I AM GIVING UP IMPORTANT RIGHTS, INCLUDING BUT NOT LIMITED TO, RIGHTS UNDER THE AGE DISCRIMINATION IN EMPLOYMENT ACT OF 1967, AS AMENDED; TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, AS AMENDED; THE EQUAL PAY ACT OF 1963; THE AMERICANS WITH DISABILITIES ACT OF 1990; AND THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED;

(iii)   I VOLUNTARILY CONSENT TO EVERYTHING IN IT;

(iv)    I HAVE BEEN ADVISED TO CONSULT WITH AN ATTORNEY BEFORE EXECUTING IT AND I HAVE DONE SO OR, AFTER CAREFUL READING AND CONSIDERATION I HAVE CHOSEN NOT TO DO SO OF MY OWN VOLITION;

(v)     I HAVE ENTERED INTO THIS EMPLOYMENT RELEASE FREELY AND WITHOUT COERCION AND I HAVE BEEN GIVEN ALL TIME PERIODS REQUIRED BY LAW TO CONSIDER THIS EMPLOYMENT RELEASE, INCLUDING BUT NOT LIMITED TO THE 45-DAY PERIOD REQUIRED BY THE AGE DISCRIMINATION IN EMPLOYMENT ACT.  I UNDERSTAND THAT I MAY EXECUTE THIS EMPLOYMENT RELEASE LESS THAN 45 DAYS FROM MY RECEIPT FROM THE COMPANY, BUT AGREE THAT SUCH EXECUTION WILL REPRESENT MY KNOWING WAIVER OF SUCH 45-DAY CONSIDERATION PERIOD;

(vi)    I UNDERSTAND THAT I HAVE SEVEN (7) DAYS AFTER THE EXECUTION OF THIS RELEASE TO REVOKE IT AND THAT THIS RELEASE SHALL NOT BECOME EFFECTIVE OR ENFORCEABLE UNTIL THE REVOCATION PERIOD HAS EXPIRED;

(vii)   I HAVE SIGNED THIS EMPLOYMENT RELEASE KNOWINGLY AND VOLUNTARILY AND WITH THE ADVICE OF ANY COUNSEL RETAINED TO ADVISE ME WITH RESPECT TO IT; AND

(viii)  I AGREE THAT THE PROVISIONS OF THIS EMPLOYMENT RELEASE MAY NOT BE AMENDED, WAIVED, CHANGED OR MODIFIED EXCEPT BY AN INSTRUMENT IN WRITING SIGNED BY AN AUTHORIZED REPRESENTATIVE OF THE COMPANY AND BY ME.


DATE: _____                    _____
                                        Sukrit Agrawal

- 5 -

Agrawal 000044

CONFIDENTIAL

## AMENDMENT NO. 1 TO EMPLOYMENT AGREEMENT

This Amendment No. 1 (the "Amendment") to Employment Agreement, dated December 3, 2018 (the "Effective Date"), by and among American Purchasing Services, LLC, a Florida limited liability company (the "Company") and Sukrit Agrawal ("Executive") is made pursuant to Section 6(j) of that certain Employment Agreement, dated September 7, 2010, by and among the Company and Executive (the "Agreement"). Unless otherwise defined herein, capitalized terms used in this Amendment shall have the meanings set forth in the Agreement.

WHEREAS, pursuant to Section 6(j) of the Agreement, the Agreement may be amended with the prior written consent of the Company, Executive and the Majority Flexpoint Ford Investors; and

WHEREAS, (a) the Company and Executive desire to amend the Agreement, effective as of the Effective Date and (b) there are no longer any Flexpoint Ford Investors.

NOW, THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.    Amendment.

(a)    The Preamble of the Agreement is hereby amended by deleting the phrase "Limited Liability Company Agreement of American Medical Depot Holdings, LLC ("Holdings"), dated as of August 30, 2010" and replacing such phrase with "Second Amended and Restated Limited Liability Company Agreement of American Medical Depot Holdings, LLC ("Holdings"), dated as of December 7, 2018".

(b)    In accordance with the revisions to the Agreement previously approved by the Board, effective as of the date hereof, Section 1(b)(i) of the Agreement is hereby amended by deleting the phrase "$200,000" and replacing such phase with "$509,975.29", which amount is the currently-existing and Board-approved compensation of Executive, and by deleting the phrase "Majority Flexpoint Ford Investors" and replacing such phrase with the phrase "Majority Wynnchurch Investors".

(c)    Section 1(b)(v) of the Agreement is hereby amended in its entirety as follows:

(v)  In addition to the Annual Base Salary, subject to terms and conditions established by the Board from time to time, the Executive shall receive an annual bonus (the "Annual Bonus"), payable within thirty (30) days following the completion of the Company's audit for each calendar year (beginning in calendar year 2019) during the Employment Period (but in any event during the calendar year following the calendar year to which such bonus applies), of (A) up to fifty percent (50%) of the Annual Base Salary based upon achievement by the Company and its Subsidiaries of the performance criteria and other goals established at the beginning of such fiscal year in writing by the Board, subject to the Required Consent ("Performance Goals"), and (B) up to one hundred percent (100%) of the Annual Base Salary based upon the Company and its Subsidiaries exceeding the Performance Goals by an amount that will be established at the beginning of such fiscal year in writing by the Board, subject to the Required Consent (the "Stretch Goals"). The Board and Executive shall agree upon the Performance Goals and the Stretch Goals for the Company and its Subsidiaries in conjunction with the approval of the annual budget for the Company. The parties agree that no Annual Bonus shall be payable with respect to the performance of the Company and its Subsidiaries in respect of calendar year 2018. Achievement of performance criteria and other goals may be

subject to confirmation by the Company's independent auditors.

(d)     Section 5 of the Agreement is hereby amended by deleting the notice address for notices to the Company and replacing such notice address as set forth below:

> "If to the Company:
>
> > American Purchasing Services, LL
> > 10315 USA Today Way
> > Miramar, FL 33025
> > Attn: Sukrit Agrawal
> > Email:  Sukrit.agrawal@amdnext.com
>
> with copies to (which shall not constitute notice):
>
> > Wynnchurch Capital, LLC
> > 6250 N. River Road, Suite 10-100
> > Rosemont, Illinois 60018
> > Attn: John Hatherly
> > Email: jhatherly@wynnchurch.com
>
> > and
>
> > Perkins Coie LLP,
> > 131 South Dearborn Street, Suite 1700,
> > Chicago, Illinois 60603,
> > Attention: James Cruger,
> > Email Address: jcruger@perkinscoie.com"

(e)     Section 6(a) is hereby amended and restated in its entirety by the following:

> "(a)     Holdings LLC Agreement. To the extent of any conflict between this Agreement and the Holdings LLC Agreement, the terms of this Agreement are expressly subject to the Holdings LLC Agreement. The Company shall enforce the provisions of this Agreement in good faith and exercise all of its rights and remedies thereunder as appropriate and in the best interests of the Company and, without the prior written consent of the Majority Wynnchurch Investors, the Company shall not amend, modify or supplement, or waive any provisions of this Agreement."

(f)     Section 6(f) of the Agreement is hereby amended by deleting the phrase "Flexpoint Ford Investors" wherever such phrase appears in such section and replacing such phrase, in each case, with the phrase "Wynnchurch Investors".

(g)     Section 6(j) of the Agreement is hereby amended by deleting the phrase "Majority Flexpoint Ford Investors" and replacing such phrase with the phrase "Majority Wynnchurch Investors".

2.     Full Force and Effect.  Except as otherwise amended hereby, the terms and provisions of the Agreement shall remain in full force and effect and any conflict between the terms of the Agreement and this Amendment shall be construed in favor of this Amendment.

3.     Complete Agreement.  This Amendment and the Agreement expressly constitute the entire agreement among the parties hereto with respect to the subject matter hereof and preempt any prior

Agrawal 000046

understandings, agreements or representations by or among the parties, written or oral, which may have related to the subject matter hereof in any way. Other than this Amendment and the Agreement, neither the parties hereto nor any of their affiliates have entered into any other agreement or arrangement (including any other amendments to the Agreement or side letters related to the Agreement) related to the subject matter hereof.

4.      Counterparts.  This Amendment may be executed in several counterparts and all so executed shall constitute one and the same instrument, binding upon all of the parties hereto, notwithstanding that all parties are not signatory to the original or the same counterpart.  Facsimile or PDF transmission of an executed counterpart of this Amendment shall be deemed to constitute due and sufficient delivery of such counterpart, and such signatures shall be deemed original signatures for purposes of the enforcement and construction of this Amendment.

5.      Governing Law.  This Amendment shall be governed by and construed in accordance with the internal laws (and not the laws of conflicts) of the State of Delaware.

[signatures on the following page]

The undersigned have each executed this Amendment as of the date first written above.

**COMPANY:**

AMERICAN PURCHASING SERVICES, LLC

By: _____

Name: _____ Sukrit Agrawal

Its: CEO

_____
Sukrit Agrawal

[Signature Page to Amendment to Employment Agreement – Sukrit Agrawal]